## NEW YORK, CHICAGO & ST. LOUIS RAILROAD CO. v. KISTLER.

1. DUTY OF RAILWAY COMPANIES AND INDIVIDUALS AT HIGHWAY CROSSINGS.

    A railway company is not bound to bring its train to a stop, or to slacken its speed, when a person is seen crossing or about to cross the railroad track, at its intersection with a highway, but may presume that the traveler will take all proper precautions to avoid injury. And it is the duty of the traveler to look out and ascertain whether a train is coming, and if it is, and there be danger in crossing, he must wait until the train passes.

2. FAILURE TO PLACE SIGN AT RAILROAD CROSSING AN ELEMENT OF NEGLIGENCE.

    Section 3333, Rev. Stat., requires railroad companies to place at railroad and highway crossings a sign, indicating that there is a crossing there. But unless plaintiff avers as a ground of negligence that the sign was omitted, he cannot insist upon it as a substantive cause of action. Evidence that there was no sign may, however, be received as bearing upon the question of contributory negligence, on the part of the plaintiff.

3. TRAVELER NOT EXCUSED FOR FAILURE TO LOOK AND LISTEN BY PARTIAL OBSTRUCTION OF VIEW OF CROSSINGS.

    A person approaching a known railroad crossing is not excused for his failure to stop and listen by the fact that his view of the crossing or an approaching train was or would be partially obstructed. It makes it his neglect to do so greater.

4. NEGLIGENCE OF FATHER, DECEASED, CONTRIBUTING TO HIS DEATH, NOT NEGLIGENCE OF DAUGHTER DRIVING WITH HIM AT TIME OF THE ACCIDENT.

    A charge to the jury, in an action for damages for wrongful death, that if the father, who was driving the team, was guilty of negligence in attempting to

cross a railroad track in advance of an approaching train, which contributed to his death, such negligence would bind his daughter, the plaintiff, who was traveling with him, is clearly in conflict with the rule laid down in R. R. Co. v. Manning, 30 O. S., 415; Transfer Co. v. Kelley, 36 O. S., 88; R. R. Co, v. Edie, 43 O. S., 91; Davis v. Garnieri, 45 O. S., 47.

5. SUFFICIENCY OF ALLEGATION TO REMIT PROOF OF NEGLIGENCE.

Court has doubt whether the allegation that "the railroad company negligently and carelessly operated and handled its said locomotive and cars" is such an allegation as would permit the reception of proof under it.

ERROR to the Court of Common Pleas of Sandusky county.

SCRIBNER, J.

This is a case in error pending in the circuit court of Sandusky county, in which the plaintiff in error, the railroad company, seeks to reverse a judgment obtained by Miss Kistler, the defendant in error, against the railroad company. The case was heard by us at Fremont in June last. The record is very voluminous, occupying between five and six hundred pages of type-written matter. It has been a very great labor to examine it with the care that its importance and justice to the parties demanded. We have not been able to give it such examination —complete our examination of the record—until quite recently, but we have gone carefully through it, and 1 shall now proceed to announce the conclusion at which we have arrived.

The plaintiff below, Miss Kistler, filed her petition in the court of common pleas of Sandusky county on November 10, 1892. She alleged the corporate existence of the railroad company, set forth the county through which the line of railway passed, and alleged that

"On or about the second of June, 1892, she was a traveler upon one of the highways of that locality in a vehicle drawn by two horses; that while so traveling at a point at or near a place where said railroad crosses said highway, defendant, by its servants, ran one of its locomotives and a train of cars thereto attached upon said railroad, and negligently and carelessly approached said highway with said locomotive and train of cars at a high, immoderate and dangerous rate of speed, and negligently and carelessly omitted to give proper and sufficient signals or warning of the approach of said locomotive and train of cars to said crossing, and of the existence of said crossing, and negligently and carelessly allowed and maintained obstructions to a proper view of said train, locomotive and railroad, and negligently and carelessly operated and handled its said locomotive and train of cars; by reason whereof the plaintiff, while so traveling in the crossing of said railroad upon said highway, and being in the exercise of due care and without fault or negligence on her part, was violently struck by said locomotive and train, and thereby dangerously, seriously and permanently bruised, injured, scarred and disfigured and thereby received unsightly marks about her head, and was thereby made very sick for a long time."

She prays judgment for $30,000 for the injuries.

The railroad company filed its answer on February 27, 1893. It admitted the corporate existence of the defendant; that it owns and operates the line of railway described in the petition; and for want of knowledge it denies all the other statements contained in the petition. And for ground of defense the defendant further says:

"If the plaintiff was injured in any degree or respect by a train upon defendant's railroad, the defendant avers and says that such injury was brought about and caused by the negligence and want of care of the

plaintiff and those to whom she entrusted her personal safety at the time, in approaching and crossing said railroad; and that the line of defendant's railroad at the place where said plaintiff was crossing the same, was visible for a long distance either way upon the side of the railroad track, along the highway which she was traveling; that there was nothing except the want of care and attention, and failure to look and listen, on the part of the plaintiff, that could possibly prevent her hearing or seeing any train approaching from either direction, as she approached said railway crossing on the highway; and that on the occasion in question, if she was injured in any respect, as she alleges, it was because she failed, neglected and refused to exercise her faculties of hearing, seeing and looking out for approaching trains, which faculties, the defendant alleges, she then had and possessed to an ordinary degree, and to the extent that people have and possess such faculties generally.   Wherefore it is alleged that plaintiff was guilty of contributory negligence."

The plaintiff in her reply to defendant's answer, filed January 22, 1894, said that she denied negligence or want of care upon her part, or any one with whom she entrusted her personal safety.   She denied also that the defendant's railroad at the place named was visible for a long distance either way, as alleged; denied that she (plaintiff) negligently exercised the ordinary faculties of seeing and hearing in looking out for an approaching train; denied that she negligently exercised ordinary care in approaching said railway or crossing, or that she was guilty of any negligence which contributed to her injury.

The case was tried to a jury, and on January 13, 1894, a verdict was rendered for the plaintiff against the railroad company for $12,000. The railroad company thereupon filed its motion for a new trial, alleging as grounds of the motion, 1. Excessive damages.   2. Verdict not sustained by sufficient evidence and contrary to law.   3. Error of law occurring at the trial, excepted to at the time; also that the court admitted testimony offered by the plaintiff and objected to by defendant, and excluded testimony offered by the defendant; and error in the charge of the court in giving certain requests.   On February 17, 1894, the motion for a new trial was overruled, and judgment was rendered for the plaintiff below on the verdict, which was excepted to.   A bill of exceptions was taken by the defendant, and filed March 17 or 27—the record states it both ways—1894.   The petition in error was filed in the circuit court on April 2, 1894.   The errors assigned are substantially those set forth in the motion for a new trial.

The line of the defendant's railway at the locality in question, as appears from the record, crosses what is known as the county line road in such manner as to form an acute angle at the place of crossing.

There was no sign-board at this crossing, giving notice of the existence of a railroad crossing.   The county line road runs directly east and west, the railroad in a northeasterly and southwesterly direction over the county line road crossing.   A public road known as the Sand Ridge road crosses the county line road and the railroad in a diagonal manner, this crossing being in a direction a little east of north.   The effect of these several crossings is to leave a small piece of land of triangular shape lying between the county line road, the Ridge road, and the railroad.   The distance from the railroad and the county line road crossing, along the county line road to the Ridge road and county line road crossing, is 202 feet; from the last named point to the Ridge road and railroad crossing, along the Ridge road, is, as stated upon a plat which was fur-

nished us, 135 feet, but as stated by one of the witnesses is 166 feet. From this point southwesterly along the railroad to the railroad and county line road crossing is 346 feet. East of the Ridge road crossing the distance between the county line road and the line of railroad increases, owing to the fact that while the county line road proceeds in a direct line east and west, the railroad bears off from the highway in a northeasterly direction. Lying east of the ·crossing is a piece of woods through which the line of railway passes. The distance from the crossing where the accident in question occurred, to this piece of woods, is estimated by some of the witnesses at from 75 to 80 rods; one witness fixing it by actual measurement at 94 rods, or 1,551 feet. The lands in the locality in question are described as being somewhat rolling in their character, possessing some inequalities of surface, but not to any considerable extent. There was nothing on the lands lying between the county line road and railroad and the woods on the east to obstruct the view of the railroad between those points, except some trees and bushes growing on the easterly side of the Ridge road. There were two trees, one a wild cherry tree, standing in or near the angle formed by the Ridge road and railroad crossing; the other was a locust, growing near the Ridge road on the east side, and several feet south of the cherry tree. Southerly of these trees, and along the easterly line of the Ridge road and railroad some bushes were growing. There was some controversy as to whether or not the cherry tree, or some part of it, was upon the lands of the company. The other tree and bushes were upon the lands of other parties. The surface of the land upon which the Ridge road is located and constructed ascends somewhat in its progress from the county line towards the railroad, so that as the latter is approached a slight cut is made, leaving a low embankment on each side of the traveled way. ·From this elevation the ground gradually slopes off toward the south and southwest.

On June 2, 1892, about 7 o'clock in the morning, Annie Kistler, the plaintiff below and the defendant in error here, in company with her father, David Kistler, was traveling along the county line road already described to the westward towards the railroad crossing. They were in a covered buggy. The buggy top was up; the side and back curtains were down, the back curtain, however, swinging loose. The buggy was drawn by two horses. The father was advanced in years, and quite deaf. He was driving. They reached the crossing, and while in the act of passing over it, the horses and conveyance were struck by a locomotive engine drawing a freight train with a caboose attached. The father was killed, and the plaintiff severely injured. The action below was brought to recover damages for the injuries so sustained by her, as shown in the petition already referred to, it being alleged that the accident resulted from certain negligent acts and conduct of the defendant already mentioned, to which I shall now proceed to call more particular attention.

First. The first charge of negligence contained in the petition is as follows: " The defendant negligently and carelessly approached and crossed said highway (the county line road) with said locomotive and train, at a high, immoderate, and dangerous rate of speed." The gravamen of the complaint here being that the railroad company, by its servants, approached the highway crossing with its train at a high and immoderate rate of speed.

The testimony of some of the witnesses on the part of the plaintiff tends to show, so far as it may be relied upon, that the train was ap-

proaching that crossing at a speed of from forty to fifty miles an hour; but they were inexperienced persons in such matters, and their judgment was very little to be relied upon in such a matter; and the testimony of some of the witnesses for the plaintiff, upon that point, was for this reason excluded by the court. The railroad men testified that the train was going at from twenty to twenty-five miles an hour. We judge, looking to the whole testimony, that it was probably going at about thirty miles an hour at the point in question.

Now it may be important to know what duty is devolved upon railway companies, and what rights the traveler may exercise in traveling or passing along a highway, especially a country highway as this was. In 2 Shearman & Redfield on the Law of Negligence, 4th ed., section 463, the rule is thus stated:

" 'The rights of a traveler on the highway, at a point where it is crossed, on a level, by a railroad, are subordinate to those of the railroad company, so far as to require the traveler to give way to any train which is in sight or hearing, though not in such a sense as to give the company a right to block up the highway; for its right is only given for the purpose of travel, not of storing its cars or goods. Both parties are, however, equally bound to use ordinary care—that is, such care as a prudent man could usually take under similar circumstances: the one to avoid committing, and the other to avoid receiving injury. For this purpose, it is the duty of the engineer to keep watch for travelers, and, upon approaching a highway crossing, it is generally his duty to give sufficient signals of the approach of the train, by ringing his bell, sounding the whistle, displaying headlights, and other sufficient light at night, or otherwise, as may be usual, and also to approach a crossing which he knows to be continually thronged with travelers, and unprotected by the company, at such a rate of speed as will enable him to check the train if necessary. More than this cannot be required, unless the engineer has actual notice of special circumstances demanding special care, such as the presence of any person or thing upon the track, or the like, or unless the crossing is so made that travelers on the highway can neither see nor hear the train or its signals in time to escape danger, in which case he must take such further precautions as he reasonably can. An engineer, on preceiving that any one is on the track, ought to blow his whistle, and to make any other signals in his power to give warning of the danger; and his failure to do so at a public crossing is strong evidence of negligence on the part of the railroad company. He ought also to slacken speed, unless well assured that it is unnecessary. But an engineer is not bound to lower his speed on approaching ordinary highway crossings in the open country, where travelers only pass occasionally; and still less at farm crossings. But if the view of the track is obstructed at such crossings, it may be negligence not to do so. If the engineer sees persons or teams approaching or waiting to cross the railroad, he is not bound to anticipate that they will attempt to cross in view of the train; and, therefore, he is not required to check his speed so much as would be necessary to enable them to cross in front of him."

In a note there is this statement of the rulings made in a case in New York, and one in New Jersey.

"It is not any want of ordinary care for a train of cars to approach a crossing at its usual speed, although there is a carriage approaching, or

standing near it. Warner v. N. Y. Central R. R. Co., 44 N. Y., 465; Telfer v. Northern R. Co., 30 N. J. Law, 188.

Now the locality here falls within the description mentioned in this language of the text:

"An engineer is not bound to lower his speed on approaching ordinary highway crossings in the open country, where travelers only pass occasionally; and less still at farm crossings."

The case of Ohio & Miss. R'y. Co. v. Walker, 113 Ind., 196, contains quotations from quite a number of authorities bearing upon this question. The fifth paragraph in the syllabus reads as follows:

"A railroad company is not bound to bring its trains to a stop or to slacken its speed when a person is seen crossing, or about to cross the railroad track at its intersection with a highway or street, but may presume that the traveler will take all proper precautions to avoid injury, and it is error to refuse to so instruct the jury in a proper case."

On page 202 and 203 of the volume, in the opinion of the court, there is a statement of the rule as established by the authorities, according to the view taken by the court:

"In a sense, the rights of the traveler and the railroad company upon a highway crossing are equal. Neither has an exclusive right to use it, and both are bound to do what the law requires of them. The right of the company is, however, superior in one respect, and that is, the right to the priority of passage. Of necessity this must be true, since it can not be legally possible that trains must be brought to a halt at every highway crossing in order to allow travelers to cross. But we need not discuss the question, for it is put at rest by the authorities."

· And the court here cite the authorities.

"A traveler who approaches the highway is bound to know that he must yield precedence to the trains, and that he has no right to expect them to slacken speed, much less to stop and yield him priority of passage. This principle is settled beyond controversy."

And other authorities are cited.

"Mr. Beach says," the court proceeds, "of a traveler about to cross a railway track: 'He must assume that there is danger, and act with ordinary prudence and circumspection upon that assumption.' Many cases are cited by this author declaring the duty of the traveler, and asserting that the company is under no obligation to stop its trains or to slacken their speed.

"Mr. Wood says: 'The law does not require the speed of trains to be slackened on approaching the crossing of a public highway in the country when a team is seen approaching it' 22 Am. R'y Law, 1330.

"This rule extends to persons on the track where there is nothing to indicate that they are not at liberty to leave it at will, if indeed, it does not go much further. We again quote from Mr. Beach: 'It is to be presumed that a person of mature years will not stand still upon a railway track and deliberately suffer himself to be run down. It is also presumed that all men are in the possession of their senses, and will exercise ordinary diligence in times of danger to take care of themselves. It is in accordance with these assumptions held, that when an engineer of a locomotive engine sees ahead of him a man upon the track, he may presume that the man possesses ordinary capacity, and that he can see, and hear, and reason from cause to effect, and that, as a train approaches him, he will step aside and not be run over.'"

Railway Co. v. Kistler.

In the New Jersey case, cited in 2 Shearman & Redfield,—30 N. J. Law, 188—the chief justice in his opinion of the case, at pages 194 and 195, describes the topography of the locality where the accident there in question occurred.    He says:

"The topography of the place clearly shows that persons about to cross may, with ordinary care, always ascertain when a train is approaching, and thus avoid a collision.

"Whether the whistle was blown and bell rung upon the approaching engine, is immaterial, if the boys knew, or with ordinary caution might have known in time to avoid the collision, that the train was approaching; but if it were material, I think the decided weight of the evidence, indeed all the reliable evidence in the case shows that the whistle was blown and bell rung as required.

"The negative testimony of the occupants of the bar-room at the time of the accident, that they did not hear it, is not entitled to much weight; accustomed as they were to the sound, it would be strange if they recollected hearing it.    The testimony of one credible witness, that he did hear it, is far more reliable, and should outweigh theirs.

"Nor does the evidence show any ground for the conclusion that there was a neglect of proper means to avoid the collision, as soon as its danger became apparent.    Every means was taken to arrest the progress of the train, when the engineer saw the attempt to cross in front of it.

"Where common highways intersect, the trains have the right of way, as against ordinary carriages; it is the duty of the latter to keep out of the way of the former.

"Although the engineer saw the boys approaching the crossing while yet at such a distance as not to indicate their ignorance of the coming train, it was his right to suppose they did not mean to attempt to cross before the train; and if he acted upon that impression, it was not negligence or want of ordinary caution on his part, although the supposition proved to be groundless."

In Railroad Co. v. Maurer, 21 O. S., 421, the general proposition is stated by the court that the traveling public and the railway companies have equal rights at the crossing of a highway by a railroad; but we do not understand the court to mean by that that the traveler upon the highway either ought to or has a right to compel the railway company to stop its trains and let him pass on the highway and across the track, but that according to the ordinary doctrine in such cases, the traveler is bound to look out and ascertain whether a train is coming, and if with ordinary care he ascertains that it is coming, that he must wait, if there be danger in crossing, until the train passes.

The second charge of negligence contained in the petition is as follows:

"The railroad company negligently and carelessly omitted to give proper and sufficient signals or warning of the approach of said locomotive and trains to said crossing, and of the existence of said crossing."

The statute of the state provides that the managers of railroad trains approaching a railroad crossing shall blow certain signals, giving notice that the train is approaching, and shall ring their bell also, giving notice; and the statute requires that this shall be done while the train is at least eighty rods distant from the crossing, and not more than one hundred rods distant.    One of the controversies in this case was as to whether or not these signals were given, and upon that point testimony was intro-

duced in either side.   The plaintiff in her testimony gave an account of the transaction as it occurred.   She is asked:

"Q.   Now do you remember having any talk with your father on the road about anything while going westward on the county line road, after you turned there at Lay's?   A.   All the talk was, when we went along there by Niles', he said he was close to the railroad track, and I should look out for the cars.

"Q.   Do you know whether that was where the woods are or not on the other side?   Were the woods on one side of you there?   A.   There was woods there; I couldn't tell you whose it was, but we was going along there when he said it.

"Q.   What did he tell you?   A.   We was close to the railroad track, and I should look out for the cars.

"Q.   What did you do?   A.   I held up the curtain behind, and I looked out as we were going along.

"Q.   You put your hand around behind him, did you, you mean?   A.   Yes, sir, I did.

"Q.   Like this?   (Indicating).   A.   Yes, sir.

"Q.   And moved the curtain?   A.   Yes, sir.

"Q.   Backward, or how?   A.   Back so I could see out.

"Q.   Did it give you a good view at the side and backward?   A.   Yes, sir.

"Q.   Toward the railroad?   A.   Yes, sir.

"Q.   Toward the north.   Did you look across?   A.   Yes, sir, I did.

"Q.   Did you listen?   A.   Yes, sir, I did.

"Q.   How was your hearing at that time, Annie?   A.   Good.

"Q.   Had you ever had any trouble in hearing ordinary sound?   A.   No.

"Q.   Did you ever have any trouble about it, to speak of?   A.   No.

"Q.   Your hearing is good yet, is it?   A.   Yes, sir.

"Q.   Did you hear any sound of any approaching train then, when you were there?   A.   No, I did not.

"Q.   Or see any train approaching?   A.   No.

"Q.   Or any steam?   A.   No.

"Q.   That indicated a train?   A.   No.

"Q.   Now, in passing along from there westward, do you remember any further things you did in the way of looking out?   A.   I saw the oil tanks."

These oil tanks were located between the Ridge road and railroad crossing and the county line and railroad crossing, to the north of the railroad, a short distance.

"Q.   Now, in passing along from there westward, do you remember any further things you did in the way of looking out?   A.   I saw the oil tanks.

"Q.   Did you know where you were when you saw the oil tanks?   A.   No, I saw them, but I didn't know where I was then."

Further on, she says:

"Q.   Have you any recollection of coming to the ridge road?   A.   Yes, sir."

That, it will be remembered, crosses the railway 202 feet east of the railroad and county line road crossing.

"Q.   Do you remember anything that happened after that at all?   A.   No, I do not.

Railway Co. v. Kistler.

"Q. Do you remember seeing a train of cars any time that day? A. No, I didn't see them.

"Q. Do you remember being struck with the cars at all? A. No, I do not.

"Q. Do you remember hearing any sound of a whistle? A. No, I do not.

"Q. Or bell? A. No, I didn't hear any at all.

"Q. Before the collision or at the time of it? A. No, I didn't hear any at all.

"Q. If you did you don't know it now? A. No.

"Q. Do you say you looked out more than once as you came along there from Niles'? A. Yes, sir, I did. I looked out several times; I couldn't tell you how many times I looked, though.

"Q. Tell us just what you did as you were going along? A. I kept raising this curtain and looking out.

"Q. Was your rig making very much noise? A. No.

"Q. I suppose there was some rattle about the old buggy? A. Not much.

"Q. A sandy road? A. Yes, sir.

"Q. And the two horses, were they on a trot or walk? A. Oh, they trotted along about like horses go.

"Q. An ordinary gait? A. Yes, sir.

"Q. Have you any knowledge of one of the horses trying to run at any place? A. No."

All this occurred, as detailed by the plaintiff, before the horses and carriage had reached the Ridge road crossing. The plaintiff testifies that after passing the Ridge road, she has no recollection whatever of what occurred; she don't remember of being struck—she remembers nothing. All that occurred between those two points is to her a perfect blank. And the statement in substance made by her is this: that the effect of the accident was to deprive her of all memory or consciousness of what had taken place between the Ridge road crossing, 202 feet from the railroad crossing at the county line road. Upon cross examination she was persistently inquired of if she didn't remember what occurred between those points, and she says not; and on re-examination she repeats her statement that she has no memory of anything that transpired between those points. She says, however, this, in the course of her testimony:

"Q. Now did you see the railroad—I mean the railroad now, not the train—when you got past the woods there, just beyond Mr. Niles'? A. You mean where we had to cross?

"Q. No, off to the right there. A. Yes, sir.

"Q. In the field? A. Yes, sir.

"Q. You could see the track off to the north, could you not? A. Yes, sir."

On page 260, in her re-examination, she there testifies:

"Q. I understand you to say you don't remember anything that occurred after you passed the Ridge road—what you say you don't remember anything about? A. After I crossed the Ridge road?

"Q. Yes. A. No.

"Q. You don't remember whether you saw oil tanks, whether you saw the railroad, or whether you saw anything or heard anything? A. No.

"Q. You have no recollection about that? A. No."

From this statement it follows, so far as the plaintiff is concerned, she is unable to give any testimony—she has no knowledge—of what transpired between those two points. As the father was killed in the accident at the time, as a matter of course, so far as the occupants of the carriage are concerned, no light is thrown upon the occurrences between those points. One of the plaintiff's witnesses is John Dymond. He testifies concerning the transaction:

"Q. Do you remember of the morning of June 2, 1892, at the time Mr. Kistler was killed? A. Yes, sir.

"Q. Where were you at that time? A. I was about ten rods north of the oil station, in the field next west of the Ridge road.

"Q. What were you doing? A. Dragging corn.

"Q. In the field? A. Yes, sir.

"Q. Did you notice the train that morning? A. Yes, sir.

"Q. When did you first notice it? A. When it was going out along them woods south of the track, east of the crossing.

"Q. Before that time did you hear the train coming anywhere along? A. No, sir."

This locality, the woods south of the track and east of the crossing, was a point about ninety-four rods east of the railway crossing and the county line crossing, and it was at that point he says that he first saw them.

"Q. Let me ask you if you remember seeing the train at the time it got there at the oil station? A. Yes, sir.

"Q. Did you hear a whistle sounded that morning? A. Yes, sir.

"Q. Where was the train when they sounded the whistle? A. Right on the Ridge crossing, or about that place.

"Q. What sort of a whistle did they give—describe it to the jury? A. It was one long, sharp whistle, and a short one."

His opinion is that the train was running about forty miles an hour, and he fixes the locality where the whistling occurred at the Ridge crossing, which is 346 feet northeast of the railroad crossing. If the testimony of the above witness is correct, the whistle sounded when the locomotive was 346 feet from the crossing. If the train was running forty miles an hour, as the witness estimated, it would have taken the train about six seconds to pass from the Ridge crossing to the county line road; if the train was running at thirty miles per hour, it would have taken it about eight seconds.

Norman D. Sharp was also a witness for the plaintiff.

He is inquired of as to the rate of speed the train was traveling at, when he gives an opinion fixing it at fifty miles an hour in his judgment; but this statement of the witness was afterwards excluded by the court. On page 82, in the course of his testimony, he testifies:

"Q. You may state whether you can ordinarily hear whistles sounding between the Ridge road crossing of the Nickle Plate on your place? A. Yes, sir, I could.

"Q. You can hear them ordinarily, can you? A. Yes, sir.

"Q. The whistling of locomotives on that railroad? A. Yes, sir, I can hear them.

"Q. You may state whether you heard any whistles sounded from the time they passed your house westward? A. Well, I don't remember whether I heard any or not; but I could hear them if I was listening or noticing.

"Q.  You don't remember whether you heard any?  A.  I don't remember whether I heard any or not.

"Q.  You have no recollection of hearing any, you say?  A.  I don't remember of hearing any."

And George Lee:

"Q.  How far do you live from Oil Station?  A.  About eighty or eighty-five rods."

Showing the diagram to the witness, and inquiring of him about that, he says he lived northeast from the oil buildings.  That was the land on which young Dymond, whose testimony I have read, was at work.

"Q.  Where were you on that morning when this accident occurred?  A.  About twenty rods north of the track.

"Q.  Which side of the Ridge road were you on?  A.  I was on the southeast side of the Ridge road, between the railroad and the Ridge road.

"Q.  Between the Ridge road and the railroad?  A.  Yes, sir.

"Q.  Do you own land in there?  A.  I do.

"Q.  What is the shape of the field you were in?  A.  It is a three-corner field, very near.

"Q.  Bounded on the south by what?  A.  The railroad.

"Q.  And on the southwest by what?  A.  Well, on the north side by the Ridge road and the fence.

"Q.  The Ridge road that runs to Galetown from the oil station down this way.  You were in that field, southeast of ridge?  A.  Yes, sir.

"Q.  How far from the railroad track?  A.  Not over twenty rods.

"Q.  What were you doing?  A.  Planting corn.

"Q.  Did you know when the local freight came along that morning going west?  A.  I did.

"Q.  About what time?  A.  Well, I should think it was about half-past 7, or such a matter—between 7 and 8.

"Q.  Do you know of the killing of Mr. Kistler and the injury of his daughter?  A.  I heard of it about a half an hour after the accident.

"Q.  Now, on that morning, did you see the train come along which struck them?  A.  I did.

"Q.  Were you then in this field you described?  A.  Yes, sir.

"Q.  What first called your attention to the train?  A.  It was the rattling of the train.

"Q.  Did you look up at it?  A.  I did.

"Q,  Which way from you was the train then?  A.  It was east of me.

"Q  And coming towards you—coming west, was it?  A.  Yes, sir.

"Q.  How far east of you was it when you first saw it?  A.  Oh, it must have been—oh, I should think a hundred rods anyhow, maybe more."

His opinion is it was going about 40 miles an hour.

"Q.  Can you see as far west as the Ridge road, from where you stood, along the railroad?  A.  Yes, sir, I could.

"Q.  What kind of a signal did you hear blow there?  A.  A sharp whistle—two sharp whistles, I think.

"Q.  And did you hear any other signals that you remember of, that morning, made by that train there, before it came to you, or after it passed you?  A.  I think not."

· This is another witness who testifies that the train whistled at the Ridge road crossing.

William B. Lay was also a witness for the plaintiff. He was plowing in a field about twenty rods from the county line road, and he was facing east during the collision. He heard the engine at about the Ridge road crossing. One of the horses, he says, was galloping, the other at a fair trot, The train was running fast. John Bowers was working at the back end of a farm about forty rods from the railroad track. He first saw the train about two miles east—or he first heard the whistle two miles east—of the county line crossing. He heard the whistles after the train had passed a certain distance.

Mr. Frank B. Allen was the telegraph operator. He was located at the oil station, about thirty feet from the crossing of the Nickle Plate track in front of the mail crane, north of the railroad track, and facing it. His office door was open. Saw the train pass. Don't remember hearing any whistles sounded ; unable to say whether it tooted in front of office ; don't remember whether it whistled or not. When he first saw the team, they were half way between Ridge road crossing and county line crossing. He first saw the train when about opposite the cherry tree. This cherry tree stands in the angle formed by the Ridge road crossing and the railroad. He says that the deceased looked out. It must have been then when they were right along there between those two points. That is the principal testimony on the part of the plaintiff touching the transaction. On the part of the defendant, a man named Jacob Baker, who was a passenger on the train, sitting in the caboose at the time, states that he was on the train. Observed the engine whistle three or four times. He saw some oil tanks about the time he heard the whistle, looked out of the window and saw some oil tanks, and remarked that he didn't know that they had got along so far. This time the whistle sounded. Seeing the oil tanks very soon after hearing the whistle, would indicate that the whistle sounded somewhere near the Ridge road crossing, as stated by some of the plaintiff's witnesses. He did not hear the bell.

Joseph Bracht, the engineer in charge of the locomotive at the time the accident occurred, testifies in substance with regard to the accident that he was on the engine in charge of its management, and, as his duty required, was not looking to the left of the road where these people were coming along, but had his eyes down the line of the railway along the right side of the train. He testifies positively that he whistled as the train left the woods some ninety rods away ; gave the usual signals for a crossing, two long and two short blasts; and the fireman, who was sitting by, rang the bell, and kept the bell ringing right along. He was in the strict performance of his duties, as he states, with his eyes on the track before him, and he did not see these people nor this carriage, nor hear anything indicating that there was any carriage passing along there, until he was upon them—perhaps within ten feet of them—and at a time when it was absolutely impossible to in any way check the speed of the train.

Thomas H. Bell was the conductor. He testifies also that the crossing signal was blown just at the point indicated by the engineer ; that the bell was rung by the fireman at that time, and that he was on duty in his usual position. And he says further that the buggy was just coming on the county line and Ridge road crossing when he saw them— that is, they were at the point where the plaintiff says that she lost all

consciousness and all knowledge of what transpired from that time forward. The conductor states that the train was then about ten car-lengths east of the Ridge road crossing.

Just at that point he saw that some one looked out of the buggy. The plaintiff in her testimony states that just at that point her father looked out, and looked around the buggy to look back. The conductor states that he had no knowledge or thought, or suspicion, that these parties would attempt to cross the railroad ahead of the train, which was in full view.

Henry Beckstein was the fireman. He testifies that he rang the bell, as testified to by the other employes; that as the train approached the county line crossing he was seated on the left side of the locomotive, facing the track. His position as fireman was upon the left side of the engine. He says that he was seated there, and he didn't see the buggy until just as it approached the crossing.

"Q. How near were you to the crossing (that is the railroad crossing and the county line road crossing) when you first saw that? A. Well, I think they must have been in the neighborhood of forty or fifty feet; may be they was further off or not that far, I could not really say that.

"Q. Did you see anybody in the buggy? A. No, sir, I did not.

"Q. What speed was the buggy going? A. Why, it seemed to me on a slow trot—ordinary trot."

Further on he testifies that he first saw the man in the buggy, Mr. Kistler, when he was 150 to 200 feet from where it struck. That would bring him about the Ridge road crossing.

Forest, the head brakeman, was seated with the fireman on that side of the locomotive, and he did not see these people coming along in the buggy until they were almost upon them.

Townsend, the rear brakeman, offers a written statement which is received as testimony here and his testimony is substantially the same as that of the other witnesses.

George Haskell was an extra brakeman. He was sitting on the cupola when he first saw the buggy. His statement is that about the time the carriage reached the Ridge road crossing he saw a man reach his head out from behind the buggy curtains, and look back, and he says that he had some suspicion or thought at that time that they intended to endeavor to get across the railroad, because, he says, that somebody in the buggy raised and slapped the line upon the horses, and the horses started to go faster at that point. The horses near the railroad broke into a sort of a gallop. He corroborates in that regard the testimony of the telegraph operator, who says that at the time he saw them, about midway between the Ridge road crossing and the railroad crossing, the off horse was going on a gallop.

That is substantially the testimony upon the facts connected with this accident.

There is an allegation in the petition to this effect: That the railroad company negligently and carelessly omitted to give the proper signals, and also neglected to give warning of the existence of the railroad crossing. Section 3333 Rev. Stat., requires railroad companies to place at railroad and highway crossings a sign, indicating that there is a crossing there. We are somewhat in doubt whether the allegation here made is equivalent to one that the company neglected to place the

crossing there.   There was no sign there, that is admitted on all sides.
The Supreme Court has held in the B. & O. R. R. Co. v. Whitacre, 35 O.
S., 627, that unless the plaintiff averred as a ground of negligence that
the sign was omitted, he cannot insist upon it as a substantive cause of
action ; but further the court holds in that case, that evidence that there
was no sign provided may be received, as bearing upon the question of
contributory negligence on the part of the plaintiff.   However, in this
case, the whole record shows that this plaintiff had knowledge of this
railroad crossing.   She didn't know precisely where it was located, but
she knew substantially where it was.   She was advised by her father, as
they were traveling along the highway, that they were near the railroad,
and she was directed to look out; and she testifies, no doubt correctly,
that she was looking out—that she did look out several times before the
carriage reached the Ridge road crossing.   Again, there are several items
of testimony which show that this plaintiff had knowledge that the cross-
ing was there, and was carefully looking out, according to her testimony,
down to the time that she reached the Ridge road crossing, for the
approaching train.

Passing to the next ground alleged as constituting negligence, we
find these allegations:   " The company negligently and carelessly allowed
and maintained obstructions to a proper view of its said train, locomo-
tive, and railroad."   There is no testimony to support this allegation,
except that some of the witnesses testified that the top of the wild
cherry tree standing on the east side of the Ridge road in or near the
angle formed by the Ridge road and the railroad crossing, overhangs, to
some extent, the railroad right of way.   In all other respects the allega-
tion that the railroad company allowed and maintained obstructions to a
proper view of its trains and railroad is disproved.   And in that con-
nection it may be proper to refer to the well known case of Penna. Co. v.
Morel, 40 O. S., 338, where the court held :

" M., approaching a railway crossing with a team drawing a loaded
wagon, heard a whistle announcing the near approach of a train, but
drove on without stopping, although his view was partially obstructed,
and the noise of his own wagon drowned that of the train ; he attempted to
cross the track because he ' thought he could get across before the train
would come.'   The locomotive damaged his person and his wagon.   Held,
the fact that the view was obstructed did not excuse his neglect to stop
and listen, it made his neglect to do so greater.   We think the evidence
clearly proved him guilty of contributory negligence."

The remaining ground of negligence set forth in the petition is as
as follows: "The railroad company negligently and carelessly operated
and handled its said locomotive and cars."   Courts are very liberal in
sustaining general allegations of negligence, even though the matter con-
stituting the negligence is not set out.   But we have very much doubt,
even under the general rule adopted by the courts in this respect, as to
whether this paragraph contains a single allegation of fact, or such
an allegation of negligence as would permit a reception of proof under it.
The case of R. R. Co. v. Harwood, 90 Ill., 425, contains this in the
opinion of the court :

" It is alleged in the first count, that the defendant ' so carelessly and
improperly drove and managed the said engine and train of cars that it
struck and so injured the said Riley Harwood that afterwards, on the
eighteenth of August, 1874, he died.'   In or by what acts the carelessness
or impropriety in driving and managing the train was manifested is not

attempted to be disclosed.  It may have been by running at a greater rate of speed than safety or prudence required, as well as by any other means.  Carelessness and impropriety are not descriptive of specific acts, but of a class of acts only, which may include an indefinite number of specific act each differing in its character from the others.  The objection really goes to the sufficiency of the declaration, and should have been taken before trial, by demurrer.  It is too late now to urge it."

In this case, before answer, there was a motion to make the petition more specific in regard to this allegation.  That motion was overruled, and the defendant thereupon proceeded to file its answer.  Upon this subject I also deem it proper to cite Coal Co. v. Strong, 49 O. S., 598, and R. R. Co. v. Dunlap, 29 Ind., 426.  We merely suggest those points upon the petition as to the sufficiency of this allegation, without ruling directly upon it.

Let us inquire, then, in what particulars it appears from the proofs that the "railroad company carelessly operated and handled its locomotive and train of cars."  The general allegation now being considered is as to the manner in which the locomotive and train of cars were being operated and handled by the company.  First, the clear preponderance of the proof shows that the engineer whistled for the railroad crossing shortly after the train emerged from the woods, more than eighty and less than one hundred rods from the crossing.  In the main, the testimony of the witnesses for the defendant—and they are quite numerous— is positive and direct, that those signals were given.  The testimony on the part of the plaintiff is uncertain, and lacks any degree of positiveness upon that subject.  In the main it is to the effect—and there is not much of it—that they didn't hear the whistle at the point near the woods ninety rods below, though they do state positively that they heard the whistle at the Ridge road crossing, three hundred and forty-six feet away from the railroad crossing.  Quite a number of witnesses state that fact.  Second.  In view of the situation, circumstances, and surroundings as shown in the record, we find that the train was not being run at an improper rate of speed at the time the accident occurred.  Under the circumstances disclosed in the case, the train operatives had a right to suppose that travelers upon the highway would not venture to cross the track in front of the approaching train, which was plainly visible for some distance down the track.  The bushes and trees complained of, in no degree intercepted the view of persons passing toward the ridge road crossing, along the county line road, west of the railroad crossing, of that part of the railroad lying between the two highways; and it is very questionable whether they obstructed the view in that part of the railway line lying to the northeast of the Ridge road.  The plaintiff and her father were both familiar with the locality and its dangers, and, as she stated, were on the lookout for the train at that point.  Whether she saw the train after passing the Ridge road crossing, or what occurred in the carriage after passing that point does not appear, for the reason, as stated by the plaintiff, that she lost all consciousness of what had occurred between the ridge road crossing and the point of the accident.  If as the train passed the ridge road crossing east, the carriage, a short distance west of the crossing, traveled at the speed shown in the record, the train would have reached past the road crossing considerably in advance of the carriage.  We made a computation from data furnished in the case touching the locality of the train and the locality of the carriage when the train came from the woods, on the basis that the train was

running thirty miles per hour and the carriage six miles per hour. Upon that basis, when the carriage was at the crossing of the Ridge road, the train was five hundred and thirty-nine feet west, to-wit : one thousand and twelve feet from the accident, six hundred and six feet east of the Ridge road—that is to say, so the train and the carriage could come together at · the point of the crossing. Assuming that the train was running at the rate of thirty miles an hour, and inquiring upon that assumption where the carriage was when the train emerged from the woods, or was ninety-four rods distant, we would have that result, that at the time the carriage crossed the Ridge road the train was five hundred and thirty-nine feet west, to-wit : it was one thousand and twelve feet from the accident, and six hundred and six feet from the ridge road. At the time the train was at the corner of the woods, the carriage was 107.8 feet from the ridge, and 309.8 feet from the place of the accident. At the time the train reached the Ridge road crossing, the carriage was seventy feet east of the accident. And as I have stated, upon tables reliable in that regard, if the train was traveling at the rate of thirty miles an hour, it would have gotten over the ground for the Ridge road crossing to the county line crossing in eight seconds ; if it was going at forty miles an hour, as stated by some of the witnesses, it would have passed over the same distance in six seconds. Of course, the faster the train was traveling—and the witnesses for the plaintiff seem disposed to make it travel at a very high rate of speed,—the nearer to the railroad crossing the carriage is placed to have the train meet it at that point.

Taking all the testimony together, it does not appear to us that the horses were running away, although, after passing the ridge road, their speed was increased. The plaintiff and one of the brakeman say that the father looked out and back at the Ridge road, and that they were not traveling at an unusual rate of speed, at least until after they passed the Ridge road crossing. The plaintiff herself says that down to that point they were going along at an ordinary jog and trotting. If these horses and carriage were not seen by the employes on the locomotive until they were within a few feet of the crossing, as testified to by them, it would have been impossible to avoid the collision. Now, considerable was said, or strong reasons were urged, for placing liability on the company, upon the fact that those employes at the engine did not see these parties. The fireman and the head brakeman were on the locomotive, seated on the left side, looking the other way, but they were looking in the direction of where they would have seen the horses and carriage or any convey-ance, had it been coming from the west instead of the east. And we cannot undertake to say that thus seated in a locomotive, there being no apparent danger, and having a right to suppose that persons traveling along a highway approaching a railroad crossing of which they have knowledge, with a train in plain sight, would not undertake to cross the track in advance of the engine ; and we can hardly regard it as a ground of negligence, under the circumstances, that they did not see those parties approaching the crossing.

Upon the whole, we are of opinion that the testimony fails to show that the company was guilty of negligence.

As to the question of contributory negligence, that is a matter of fact which we do not feel called upon to pass upon in this case, as the case must go back again for a new trial. ·

The exceptions taken by the railroad company through its counsel to the refusal of the court to give the request of the company and to the

instructions that were given by the court, we do not think should be sustained. We think the court committed no error, either in its charge or in its refusal to charge, except in this regard, and that effects the plaintiff below: The court very distinctly charged two requests of counsel for the railroad company, and also carried into its main charge explicity, instructions to the jury, that if the father, who was driving the team, was guilty of contributory negligence in the matter, the contributory negligence which would bind the father, would bind the plaintiff, the daughter, who was traveling with him; which is clearly in conflict with the rule laid down in Ohio, in Railroad Co. v. Manson, 30 O. S., 415; Transfer Co. v. Kelly, 36 O. S., 88; Railroad Co. v. Eadie, 43 O. S., 91; Davis v. Guarnieri, 45 O. S., 470. Inasmuch as the father was deaf and old, and had taken his daughter along partly for the purpose of furnishing him eyes and ears, if it had appeared that she had neglected this duty in any respect, so that the negligence would be her negligence and not the father's, as a matter of course, the plaintiff below would be liable; but to charge in a broad and emphatic way that if the father was guilty of negligence, then the daughter was responsible for it, was error.

For these reasons the judgment of the court of common pleas will be reversed, the verdict set aside, and a new trial granted, and the case remanded for further proceedings.

Defendant in error excepted.